O37IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| **LHP OT HOLDINGS, LLC,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CASE NO: 4:26:CV-00108** |
| | § | |
| | § | |
| **BROWN, WINICK, GRAVES,** | § | **JURY TRIAL DEMANDED** |
| **GROSS AND BASKERVILLE, P.L.C.** | § | |
| **and DREW LARSON,** | § | |
| | § | |
| *Defendants.* | § | |

## COMPLAINT

Plaintiff LHP OT Holdings, LLC ("Leon"), as assignee of rights, claims, and privileges of Turnwell Mental Health Network, Inc., Pathway Healthcare Services, LLC, Scott Farber ("Farber"), and Mental Health Partnership, LLC ("MHP"), file this Complaint against Brown, Winick, Graves, Gross and Baskerville, P.L.C. ("BrownWinick") and BrownWinick attorney, Drew Larson ("Larson," and with BrownWinick, the "Defendants") and alleges as follows:

## SUMMARY

BrownWinick and Larson represented MHP, a Delaware LLC, at all times relevant to the alleged claims, since 2019. BrownWinick drafted MHP's core governance documents and negotiated and drafted the investment agreements under which Leon invested $5 million into MHP in March 2022—agreements designed to protect Leon through board-level oversight and consent rights over major transactions and certain indebtedness.

Those protections were not optional.

But BrownWinick did not ensure that those protections were implemented. MHP never amended its Operating Agreement to add the Turnwell manager to MHP's board as required at closing. And BrownWinick never advised MHP's CEO, Scott Farber, that the amendment had to be made to effectuate the governance and consent protections of the investment agreements with Leon. Instead, BrownWinick (a) knowingly helped Farber circumvent those required protections—all while the firm simultaneously represented Pathway Healthcare Services, LLC ("Pathway"), the very counterparty negotiating to acquire MHP's most valuable assets in 2023, (b) acted to help MHP interfere with and contravene Leon's rights in connection with multiple transactions, and (c) acted, itself, to intentionally interfere with Leon's rights.

As only a few examples of BrownWinick's malfeasance, BrownWinick allowed and failed to advise MHP *against* MHP's CEO, Scott Farber, acting simultaneously as Pathway's CEO without disclosure before the closing of any transaction between MHP and Pathway. Indeed, while still serving as MHP's CEO, and under BrownWinick's watchful eye, Farber signed key transaction documents agreeing to sell MHP's equity in its operating subsidiaries to Pathway for $18.5 million—at roughly a 25% discount to a "conservative" $25 million valuation from only a year earlier. That same day, Farber signed third-party acquisitions for **Pathway as its CEO**. Farber then signed a predatory loan agreement for Pathway's benefit as its CEO that encumbered certain of MHP's assets without (i) any consideration to MHP and (ii) disclosure to the members and managers of MHP. Such events are textbook breaches

---

of Farber's duties of loyalty: Farber serving two masters at the same time—aided and abetted by the law firm simultaneously representing those counterparties.

BrownWinick also helped structure and document additional indebtedness and encumbrances on MHP's assets without the required approvals—including a secured note to Pathway and agreements affecting MHP's collateral position when MHP owed ~$1.6 million under a factoring arrangement. BrownWinick then backdated a Transition Services Agreement at Pathway's request—an agreement that diverted revenue streams from BrownWinick's concurrent client MHP—in an attempt to circumvent specific approval requirements.

Yet when Pathway failed to perform under that agreement, BrownWinick declined to enforce its client MHP's rights and told Farber it was a business issue to work out. Indeed, as MHP's financial condition deteriorated in early and through the Spring of 2024, BrownWinick moved to protect Pathway, *not MHP*. In April 2024, BrownWinick's internal communications reveal the stated goal was to ensure Pathway was "clearly protecting itself" regarding assets that pursuant to agreements were to generate significant revenue for MHP. BrownWinick, without disclosure to MHP or its managers, then drafted documents moving those assets from under MHP into a newly created Pathway entity just before "terminating" the previous transaction documents between Pathway and MHP; still, Larson was, since August 2022, personally invested in the transaction without disclosure through his personal LLC, DSIF Investments.[1]

---

[1] Drew Larson is a Member of BrownWinick and was the lead corporate lawyer for MHP for several years leading up to the events at the center of this lawsuit.

MHP, valued at over $25 million before entering into the Unit Purchase Agreement with Pathway in November 2023, is now worthless. On January 15, 2026, the Texas Business Court entered an $18 million judgment against MHP for breaches of the investment agreements with Leon. Those damages are the direct result of BrownWinick's and Larson's knowing and intentional conduct. Leon thus brings these claims individually and as assignee of MHP's claims and privileges, seeking to hold BrownWinick and Larson responsible for aiding and abetting fiduciary breaches, and tortious interference.

## PARTIES

1.      Plaintiff LHP OT Holdings, LLC is a Delaware limited liability company with its principal place of business in Dallas County, Texas. Each of the current members of Plaintiff LHP OT Holdings, LLC is a citizen of Texas.

2.      Defendant Brown, Winick, Graves, Gross and Baskerville, P.L.C. is an Iowa professional limited liability company with its principal office at 666 Grand Ave., Suite 2000, Des Moines, Iowa 50309, and may be served through its registered agent, Sean P. Moore, 666 Grand Ave., Suite 2000, Des Moines, Iowa 50309 or wherever it may be found. Each of the current members of Defendant Brown, Winick, Graves, Gross and Baskerville, P.L.C. is a citizen of Iowa.

3.      Defendant Drew Larson is an individual that resides in and is a citizen of Iowa, and may be served at 3127 Jordan Grove, West Des Moines, Iowa 50265.

## JURISDICTION AND VENUE

4.      Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, because there is complete diversity between Plaintiff and Defendants and their respective members, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      The Court has personal jurisdiction over Defendants because each is a citizen of the State of Iowa and has purposefully availed itself of the benefit of doing business in this state.

6.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendants reside in this juridical district.

## BACKGROUND FACTS

7.      Unless otherwise stated, the following facts come from the Findings of Fact and Conclusions of Law in the Final Judgment of the Business Court of Texas, First Division, in the case styled *Turnwell Mental Health Network, Inc. v. Mental Health Partnership, LLC et al.*, Cause No. 25BC01B-0002, 1st Division and/or the sworn declaration by MHP's CEO, Scott Farber, both which are publicly available on the Business Courts of Texas's docket and fully incorporated by reference herein.

8.      Prior to filing this suit, Leon sent Defendants a letter, requesting that the parties mediate the dispute.

9.      As part of the request to mediate pre-suit, Leon provided Defendants with copies of the Texas Business Court's Final Judgment and Farber's sworn declaration.

10.     Leon also offered to share a preliminary expert opinion on BrownWinick and Larson's conduct, prepared by Leon's retained expert, the Honorable Mark W. Bennett (Ret.).

11.     Defendants rejected Leon's mediation efforts.

## I.     Leon invests $5,000,000 in MHP through a convertible note.

12.     Since around August 2019, BrownWinick was engaged by MHP to represent MHP and its affiliates in general corporate and transactional matters, including acquiring mental and behavioral health providers.

13.     BrownWinick drafted key corporate governance documents for MHP, including MHP's Operating Agreement, effective as of January 31, 2020 ("Operating Agreement").

14.     In March 2022, Leon invested $5,000,000 into MHP under a Convertible Promissory Note Purchase Agreement, Convertible Promissory Note, and Investor Rights Agreement (collectively, the "Investment Documents").

15.     BrownWinick negotiated and drafted the Investment Documents on behalf of MHP. After executing the Investment Documents, Leon assigned its rights under those agreements to its affiliate, Turnwell Mental Health Network, Inc. ("Turnwell").[2]

### A. The Note Purchase Agreement.

16.     Section 6.2 of the Note Purchase Agreement states that MHP "shall not create, or authorize the creation of, or issue, or authorize the issuance of any additional Securities or other interests in [MHP] senior in priority to the Note in excess of 4.5 times the [MHP's] trailing 12-month earnings before interest, taxes, depreciation and amortization, without the prior approval of Turnwell."

---

[2] For simplicity's sake, the words "Turnwell" and "Leon" are used interchangeably to refer to the Plaintiff in this lawsuit.

### B. The Note (as amended).

17.    The Note was attached to the Note Purchase Agreement as an exhibit.

18.    Section 1.1 of the Note provides that the $5,000,000 will accrue 6% of simple interest annually "until the earlier of (i) repayment of this Note in full, including all principal and accrued interest, and (ii) conversion of this Note according to its terms." The Note, in relevant part, specifies it is convertible into "Class A Units" in MHP upon a "Change of Control," at the election of Turnwell.

19.    Section 2.1.1 of the Note defines "Change of Control" to mean either "(a) a transaction or series of related transactions in which a person, or a group of persons acting in concert (other than Holder), acquires from Members of the Company units representing more than fifty percent (50%) of the outstanding voting power of the Company or (b) any sale or other disposition of all or substantially all of the assets of the Company."

20.    Section 3.1 also requires MHP to provide Turnwell with a written notice at least 15 days before closing any transaction constituting a Change of Control, specifying the terms of the transaction and terms under which the Note would convert.

21.    Section 4.2 defines "Event of Default" as any event whereby MHP "materially breaches any representation or warranty contained in or fails to comply with, any of the terms or covenants of this Note, the Purchase Agreement or that certain Investor Rights Agreement, dated as of March 7, 2022 (the 'Investor Rights Agreement'), by and between [MHP] and [Leon], and such breach or failure is not cured within 120 days after the Turnwell Holder has given the Company written notice of such breach or failure …"

22.     Lastly, Section 4.1 provides two options for Turnwell "upon the occurrence of an Event of Default." One, "this Note shall become immediately due and payable without any declaration or other act on the part of [Turnwell]," which shall accrue at an annual interest rate of 10%. Or two, Turnwell may "proceed to protect and enforce its rights" through "specific performance" of the Note or Note Purchase Agreement.

**C.  The Investor Rights Agreement.**

23.     The last of the three integrated agreements signed March 7, 2022, is the Investor Rights Agreement, which, in Section II.4(a) required MHP to amend at closing its Operating Agreement "to provide that [MHP] will be managed by three Managers, one of which will be designated by [Turnwell]" ("Turnwell Manager").

24.     Turnwell designated Stan Twarog as the Turnwell Manager at the closing on March 7, 2022.

25.     Section II.4(c)(i) states for as long as Turnwell had the right to designate a manager, MHP "agrees that it shall take, and shall cause the other members to take, all such actions as may be required to ensure that the number of Managers is not increased beyond three without the prior written consent of [Turnwell]."

26.     Critically, Section II.5(a) of the Investor Rights Agreement also barred MHP from "enter[ing] into any transaction, or any agreement to *enter* into any transaction, which would result in a sale of more than fifty percent (50%) of the assets or voting Units of [MHP] (a 'Sale Transaction')" without the Turnwell Manager's prior written approval. The only situation in which MPH could consummate a "Sale Transaction" without the Turnwell Manager's prior written approval was if Turnwell, because of that Sale Transaction, would

receive "returns on its investment equal to at least (i) the amount invested by Investor in the Company (which, for the avoidance of doubt is $5,000,000 as of the date of this Agreement) multiplied by 2.5 and (ii) the Guaranteed Rate of Return on such invested amount." Section I.4 of the Investor Rights Agreement defines "Guaranteed Rate of Return" to mean "a 20% compounded internal rate of return based on actual cash paid to [MHP]." Today, an amount calculated under Section II.5(a) would equal approximately $21.5 million.

27.    The Investor Rights Agreement also barred MHP from "enter[ing] into any agreement to incur indebtedness . . . that would result in a debt service coverage ratio of less than 1.50" under Section II.5(b).

28.    The Investment Documents were integrated via amendment so that a breach of one of the Investment Documents constituted a breach of all the Investment Documents. Turnwell assigned to Leon all rights under the Investment Documents, as well as all settlements, claims, and privileges obtained from Pathway, MHP, and Farber.

29.    The Investment Documents provided Turnwell with governance rights, oversight protections, and prior approval authority over major transactions, debt issuance, and changes in corporate control or the nature and scope of MHP's business.

30.    The Operating Agreement was never amended to include the Turnwell Manager.

31.    At no point after the Investment Documents' execution did BrownWinick advise MHP or its CEO, Farber, that MHP's Operating Agreement needed to be amended to add Mr. Twarog as a member of MHP's board of managers.

32. Likewise, at no point after the Investment Documents' execution did BrownWinick advise MHP or its CEO, Farber, that MHP's Operating Agreement needed to be amended to affect the other requirements of the Investment Documents.

## II. Drew Larson personally invests in MHP through VB Acquisitions Corp. without disclosure to Turnwell or the members of MHP.

33. During 2022 and thereafter, Farber and another then-manager of MHP, Jeremey Schwach, were managing an affiliated business named VB Acquisition Corp. ("VBAC"). According to a Form D filed with the Securities and Exchange Commission, Farber and Schwach were both directors of VBAC.

34. VBAC began soliciting investors in May 2022 to fund the purchase of TheraManager, an electronic medical records and practice management software company. TheraManager's software would allow VBAC to be an "ecosystem partner" to MHP, with the relationship serving "as a competitive advantage by enabling VBAC to co-develop and rapidly pilot new features."

35. BrownWinick represented VBAC in the raising of funds and acquisition of TheraManager.

36. According to documents within Turnwell's (and Defendants') possession, VBAC raised $9,290,000 through the sale in August 2022 of its Preferred A Shares to help finance the purchase of TheraManager.

37. MHP paid VBAC $1,675,000 to buy 442,544 Preferred A Shares and then, to "strategically align VBAC with MHP," MHP also executed an equity swap concurrent to closing, where MHP "swapped" 31,782 of MHP Class A units—valued at $1,250,000 based

on a "conservative MHP valuation" of $25 million—for an additional 330,251 VBAC Preferred A shares. VBAC thus held approximately 5% equity in MHP post-closing.

38.    On information and believe, BrownWinick represented MHP and VBAC in the equity swap.

39.    Likewise, to facilitate "friends and family" investments, Farber, Jeremy Schwach, and VBAC created VBAC Investors SPV, LLC ("VBAC SPV"), which purchased $2,305,000 of Preferred A Shares.

40.    According to the VBAC SPV's cap table, one investor in VBAC SPV is DSIF Investments LLC.

41.    DSIF Investment LLC was and still is an entity owned and controlled by Larson.

42.    Larson's ownership and control of DSIF Investment LLC is evidenced by, among other things, the entity's corporate address, which is a residential address in Clive, Iowa that was owned by Drew Larson and sold via warranty deed in November 2025.

43.    Put simply, as of August 2022, and, apparently at least until November 2025, Larson was personally invested in MHP through VBAC, which was never disclosed to Turnwell, or, on information and belief, to the members of MHP (other than Farber).

### III.    BrownWinick aids MHP with entering into factoring agreements, encumbering the assets of MHP and its subsidiaries without member or manager approval.

44.    On December 5, 2022, MHP, its two operating subsidiaries, MHP Iowa, LLC and MHP Idaho, LLC, and the clinical entities owned by MHP Iowa and MHP Idaho, entered into a Factoring and Security Agreement with Paychex Advance LLC for the sale of certain accounts receivables by MHP or its affiliated entities ("Factoring Agreement").

45. As collateral for its obligations, MHP pledged its equity interests in its subsidiaries.

46. Farber signed the Factoring Agreement on behalf of MHP and its subsidiaries as an authorized officer.

47. BrownWinick represented MHP, its subsidiaries, and the clinical entities owned by the subsidiaries in connection with the Factoring Agreement.

48. Yet BrownWinick failed to advise Farber to obtain or seek the consent of all members and managers of MHP before or after executing the Factoring Agreement.

49. Likewise, BrownWinick failed to advise Farber to obtain the Turnwell Manager's consent as required by Section II.5 of the Investor Rights Agreement.

50. By early November 2023, MHP and its affiliates jointly owed approximately $1.6 million to Paychex.

## IV. Farber begins acting as the CEO of Pathway Healthcare Services, LLC, a potential acquirer of MHP.

51. In or around March 2023, Farber, on behalf of MHP, began substantive discussions with Pathway regarding Pathway acquiring MHP's equity in its operating subsidiaries and other unaffiliated entities in the mental and behavioral health space.

52. Based on documents obtained by Turnwell, Farber was submitting joint indications of interest with Pathway to those other third-party entities that describe the acquisition of MHP by Pathway as early as March 2023.

53. In Summer 2023, Pathway's then-manager and largest equity owner, Scott Olson, asked Farber to serve as the CEO of Pathway while continuing to serve as MHP's CEO.

54.     Farber accepted and began his role as Pathway's CEO in August 2023. Farber did not disclose this fact to Turnwell or the other members and managers of MHP at the time.

55.     On August 15, 2023, Farber provided Turnwell with an Indication of Interest ("IOI") from Pathway and a Project Roadmap Executive Summary describing Pathway's proposed acquisition of MHP.

56.     As outlined in the IOI, Farber would receive a four-year employment contract to be the CEO of an unnamed "Holdco" after Pathway's acquisition of MHP.

57.     On or around August 23, 2023, BrownWinick provided MHP with a Conflict of Interest Disclosure and Waiver, signed by Larson on behalf of BrownWinick, so that BrownWinick could also represent Pathway concurrently with MHP ("Conflict Waiver").

58.     The Conflict Waiver states that "Pathway and MHP Have been in discussions for a number of months about joining forces to create a merged entity," and that "[t]he two parties are already collaborating and are in joint communications with third party rollup targets." What's more, "[i]n their discussions of how to integrate the two businesses, the parties expect and *have already partially adopted a joint leadership structure*."

> Pathway and MHP have been in discussions for a number of months about joining forces to create a merged entity that would serve as the springboard for the rollup of a number of service providers in the mental and behavioral health space. The two parties are already collaborating and are in joint communications with third party rollup targets. In their discussions of how to integrate the two businesses, the parties expect and have already partially adopted a joint leadership structure. Formally, it is expected that Farber will serve as the CEO of Pathway going forward with Scott Olson (the co-founder and CEO of Pathway) ("**Olson**") serving as the board chair focused on strategic growth and finance matters. Together, they have determined that they would like the Firm to take the lead in assisting with the various acquisitions and rollups of the various targets into Pathway.

59.     Farber signed the Conflict Waiver on behalf of MHP as its CEO, understanding that a conflict would exist, at least with regards to the negotiation of any agreements directly between MHP and Pathway until the closing of any combination of MHP and Pathway.

60.     BrownWinick failed, however, to advise Farber to obtain prior consent from the Turnwell Manager or the members and managers of MHP before executing the Conflict Waiver on behalf of MHP.

61.     As stated in Farber's sworn declaration, Farber failed to disclose the Conflict Waiver to the Turnwell Manager and the other members and managers of MHP *based on the advice of BrownWinick and/or Larson*.

62.     On August 30, 2023, Stan Twarog, acting as "Investor Manager" for Turnwell under the Investor Rights Agreement, declined to provide written approval of the proposed Pathway transaction and instead proposed alternative economic terms for Turnwell's consent.

**V.     Despite Turnwell declining to approve the proposed transaction between MHP and Pathway, Farber signs and closes acquisition documents as Pathway's CEO without the knowledge or consent of MHP's members and managers, all while still acting as MHP's CEO.**

63.     Throughout Fall 2023, Farber—while still serving as MHP's CEO—was negotiating, with BrownWinick and Larson's assistance, the acquisitions of Chiron Psychological Inc. ("Chiron"), Life Connections, L.C. and Beyond Behavior ABA Services, LLC (collectively, "Life Connections"), and Lido Wellness Center ("Lido") on behalf of Pathway as its CEO.

64.     On November 6, 2023, Farber emailed the members and managers of MHP (other than Turnwell or the Turnwell Manager) that MHP and Pathway would be finalizing a

transaction and "[a]t the conclusion of this transaction, "I will be assuming the role of the CEO of the entire group."

65.    Farber failed to disclose, however, any details about the CEO role, nor did he ever disclose to the members and managers of MHP that he was already (since Summer 2023) acting as Pathway's CEO prior to the conclusion of any transaction with Pathway.

66.    On November 9, 2023, Farber brought about an Action by Consent of the Members and Managers of MHP, whereby MHP's members and managers purported to approve the sale of MHP's equity interests in MHP Iowa and MHP Idaho under an equity purchase agreement ("Action by Consent").

67.    Based on advice from BrownWinick, Farber did not disclose the existence of this Action by Consent to Stan Twarog or Turnwell or ask them to participate.

68.    The Action by Consent, which BrownWinick drafted, did not even include a space for the Turnwell Manager to sign. Turnwell did not receive a copy of this Action by Consent until July 2, 2024.

69.    BrownWinick also failed to advise Farber that a fairness opinion (and other protections and disclosures) was necessary under Delaware law given his personal interest in the proposed transaction with Pathway.

70.    No fairness opinion was obtained; no disclosures were made.

71.    Unbeknownst to Turnwell or the other members and managers of MHP, on November 22, 2023, Farber signed the Asset Purchase and Contribution Agreement of Chiron ("Chiron Acquisition") as the CEO of Pathway, the CEO of Pathway Healthcare – California, LLC, and the director of Pathway Clinical – California, PC.

**Pathway:**

PATHWAY HEALTHCARE SERVICES, LLC

By: *Scott Farber*
Name: Scott Farber
Title: CEO

72.     Signing one transaction as Pathway's CEO, however, was not enough. That same day, Farber also signed the Unit Purchase and Sale Agreement of Life Connections ("Life Connections Acquisition") as Pathway's CEO.

73.     BrownWinick and Larson were fully aware of Farber's official acts as Pathway's CEO, as they represented Pathway in both the Chiron and Life Connections Acquisitions.

74.     What's worse, however, is that BrownWinick not only advised Farber not to disclose that he was already closing acquisitions as the CEO of Pathway—the same company simultaneously negotiating with him to acquire MHP—but also advised Farber that obtaining the consent of the managers and/or members of MHP (including Turnwell) was unnecessary.

75.     That same day, Pathway and Farber agreed to enter into a Unit Purchase and Sale Agreement whereby MHP would contribute and sell 100% of MHP's outstanding equity interests in MHP Iowa and MHP Idaho to Pathway ("Pathway UPA").

76.     Pathway, *prior to* the closing of the Pathway UPA, would also have the rights under the Pathway UPA—in express contravention of Turnwell's rights—to appoint two additional managers to MHP's board of managers, and, as a condition to closing, to approve in its sole discretion, the "consent" of Turnwell to the sale.

77.    The total consideration under the Pathway UPA was $18,500,000, despite MHP's "conservative valuation" of $25 million only a year earlier. Farber signed the Pathway UPA as MHP's CEO.



78.    BrownWinick represented both parties in the drafting, negotiation, and execution of the Pathway UPA.

79.    So put simply, on the same date Farber was signing acquisitions for the benefit of Pathway as its CEO, Farber was agreeing to sell MHP's most valuable assets to Pathway as MHP's CEO at about a 25% discount to MHP's "conservative valuation" from only a year prior—without disclosure to or consent of MHP's members and managers, without a fairness opinion, and without recusing himself from any approval vote—all under BrownWinick's "counsel."

80.    Again on November 22, 2023, Pathway and Farber agreed to enter into a Secured Note and Security Agreement under which MHP could borrow up to $1,500,000 from Pathway at 8% annual interest, payable one year later ("Secured Note," with the Pathway UPA, "Pathway Transaction").

81.    The collateral for the Secured Note included a pledge of MHP's equity in its subsidiaries, then currently pledged to Paychex under the Factoring Agreement.

82. Around this time, MHP and its affiliates jointly owed approximately $1.6 million to Paychex.

83. Farber signed the Secured Note as MHP's CEO.

84. Farber failed to inform or seek the approval of MHP's managers or Turnwell before signing the Secured Note.

85. Despite BrownWinick drafting and executing the Secured Note on behalf of both parties, BrownWinick failed to advise Farber that disclosure to and approval from MHP's managers (including the Turnwell Manager) and Turnwell was necessary.

86. The indebtedness under the Secured Note resulted in MHP having a debt service coverage ratio of less than 1.50 without Turnwell's prior written approval, thereby breaching the Investment Documents.

87. Several days later, on November 27, 2023, MHP and Turnwell executed a letter agreement under which Turnwell agreed to consent to a sale of MHP's equity interest in MHP Iowa and MHP Idaho to Pathway *contingent upon* receipt of consideration outlined in that agreement ("Letter Agreement").

88. BrownWinick represented MHP in the negotiation and drafting of the Letter Agreement.

89. At no point before the Letter Agreement did Farber inform Turnwell that MHP had already agreed to enter the Pathway UPA and the Secured Note or disclose the terms thereof to Mr. Twarog (the Turnwell Manager) or Turnwell.

90. Despite its awareness of this fact, BrownWinick did not advise Farber to disclose those facts to Turnwell.

91.    Likewise, after the execution of the Letter Agreement, Turnwell was not aware that MHP had *entered into* the Pathway UPA and Secured Note because Farber, in consultation with BrownWinick, did not send Turnwell copies of the Pathway UPA (or any of the schedules or exhibits thereto)[3] and the Secured Note (or any drafts thereof) until June 30, 2024; nor disclose to Turnwell any of the terms and conditions of such agreements.

## VI.    BrownWinick facilitates the demise of MHP's business through backdating agreements, encumbering assets without approval, and failing to protect MHP's interests.

92.    By November 2023, BrownWinick and Larson learned that the entity committed to finance Pathway's acquisitions targets, which included MHP, had severely cut the amount it was willing to provide.

93.    BrownWinick and Larson also knew that the Pathway UPA required MHP to be debt free as of closing.

94.    Yet as outlined above, MHP was then obligated to repay various debts, including the approximately $1.6 million owed to Paychex under the Factoring Agreement. In an attempt to solve MHP's debt shortfalls—which still existed after the Pathway UPA had already been agreed to—BrownWinick and Larson facilitated at least two transactions.

95.    First, on December 13, 2023, MHP and Pathway agreed to enter into a Transition Services Agreement ("TSA"), pursuant to which MHP caused the transfer of all rights to the fees, payments, and other compensation that MHP Iowa and MHP Idaho were entitled to under Management Services Agreements ("MSA") with mental and behavioral

---

[3] BrownWinick was the preparer of the schedules to the Pathway UPA, which to date still have not been given to Turnwell.

health clinicians and their entities. In exchange, Pathway would assume responsibility for all MHP Iowa's and MHP Idaho's respective management, financial, operational, and administrative obligations and costs under the respective MSAs.

96.    That same day, Pathway's manager, Scott Olson, requested BrownWinick backdate the TSA to November 24, 2023 before circulating it for signature.

97.    BrownWinick complied with that request as, upon signing, the TSA was backdated to an effective date of November 24, 2023.

98.    From late 2023 through 2024, Pathway failed to fulfill its obligations under the TSA, which detrimentally affected MHP's cash flow.

99.    When Farber approached BrownWinick with this issue, the firm advised him that this was merely a business issue to work out with Pathway and declined to act on MHP's behalf to enforce the TSA.

100.    Second, on or about December 18, 2023, Pathway borrowed $2,650,000 from C6 Capital, listing both Pathway and certain affiliates and subsidiaries of MHP as borrowers and encumbering many of MHP's assets. This loan was to be used solely to facilitate Pathway's acquisition of Lido, then scheduled to close on December 19, 2023.

101.    BrownWinick was then acting as counsel to Pathway in connection with its acquisition of Lido.

102.    On or about December 18, 2023, Farber signed a Consent of Managers *as CEO of Pathway* to approve the C6 Loan ("C6 Loan Consent").

103. BrownWinick, as counsel for Pathway *despite still being MHP's counsel*, advised Farber to sign the C6 Loan Consent, the effect of which was to further encumber MHP's assets already encumbered by the Factoring Agreement and the Secured Note.

104. BrownWinick failed to advise Farber of the conflict between Pathway and MHP in connection with the C6 Loan.

105. Nor did BrownWinick at any point advise Farber and MHP that he and MHP should obtain the consent of the managers (and/or members) of MHP before signing and executing the C6 Loan Consent (as the CEO of Pathway) or that he should disclose the existence of the C6 Loan Consent to the other members and managers of MHP.

106. As a result, Farber—who was then still MHP's CEO—failed to obtain the consent of any of the members or managers of MHP before encumbering MHP's assets further through the C6 Loan.

107. Because of these willful and knowing failures by BrownWinick and Larson, MHP experienced severe financial uncertainty and solvency issues in the first six months of 2024.

108. BrownWinick and Larson were MHP's lawyers that assisted MHP's efforts to find the needed funding, including their advice and counsel in connection with the possible funding by Catalur Capital and/or Itria.

## VII. As MHP's financial condition deteriorates, BrownWinick moves to protect Pathway, not MHP.

109. In April 2024, Pathway and BrownWinick realized that the Life Connections Acquisition resulted in all of Life Connections assets becoming subject to agreements to generate revenue for MHP. In other words, if Pathway tried to end its relationship with MHP,

---

**COMPLAINT**                                                                 **PAGE 21**

those assets would remain subject to agreements with a subsidiary of MHP. Accordingly, Pathway enlisted BrownWinick's assistance.

110. As stated in an email by Larson, Leon was "rattling its saber a bit," but BrownWinick needed "to make sure that Pathway is clearly protecting itself with respect to the Life Connections assets."

> @Daniel, William T., I would like you to coordinate with Marcos on the following. As context, Leon is rattling its saber a bit and we want to make sure that Pathway is clearly protecting itself with respect to the Life Connections assets, which it purchased and paid for.

111. To that end, and without MHP or Turnwell's knowledge, BrownWinick created a new Iowa entity, Pathway Clinical IA, PC, to circumvent MHP's contractual rights and significant revenue.

112. To further protect Pathway in April 2024, BrownWinick also filed a UCC statement for the Secured Note on behalf of Pathway.

113. On July 1, 2024, Turnwell delivered to MHP a notice of default by MHP of its obligations and covenants under the Investment Documents, a copy of which was sent to Pathway by Larson on or about July 2, 2024. Mr. Twarog resigned as Turnwell Manager in early July 2024.

114. Also on July 1, 2024, Pathway's President and COO, Andrew Turner sent an email to BrownWinick that stated, "[c]onsidering the developments over the last few days as it relates to MHP, there is urgency around making sure LC and BB are disassociated with [MHP's clinical entity] ASAP."

115. In response, BrownWinick finalized and filed the documents creating Pathway Clinical IA that same day.

116.    Then, the very next day, July 2, 2024, and only after MHP had been emptied of revenue-generating clinical assets, Larson, on behalf of BrownWinick, informed Pathway *for the first time* that Pathway was maneuvering in a manner "arguably directly adverse to MHP." Incredibly, Larson never informed MHP that Pathway was operating "directly adverse" to it.

117.    Equally striking, however, is Larson's statement on July 3, 2024: "With the joint representation, I am just not in a position to be directly adverse to either of you (MHP or Pathway)"—belied by BrownWinick and Larson's multiple actions prior thereto. As of then, Pathway owed BrownWinick in excess of $250,000.

118.    Likewise, Pathway (by email) terminated Farber as its CEO on July 2, notwithstanding that as late as June 30, 2024, Pathway was telling investors that Farber was its CEO.

119.    In February 2025, Turnwell sued MHP, Farber, and Pathway, alleging various claims arising out of the Investment Documents and the Pathway Transaction. Through that litigation and settlements thereof, Leon now owns all claims—and privileges associated with those claims—against BrownWinick and Larson from Pathway, MHP, and Farber.[4]

120.    On January 15, 2026, the Business Court of Texas, First Division, entered judgment against MHP for breach of the Investment Documents in the amount of $18,000,000 plus pre- and post-judgment interest. In support of that judgment, the Texas Business Court entered findings of fact and conclusions of law.

---

[4] *See* Footnote 1 *supra.*

## CAUSES OF ACTION

### I.    First Cause of Action: Aiding and Abetting Breach of Fiduciary Duties against BrownWinick and Larson

121.    Leon re-alleges and incorporates by reference all the allegations set forth above.

122.    Farber served as MHP's CEO and as a manager of MHP and, as such, owed fiduciary duties of loyalty, care, and disclosure to MHP and its members and managers, including duties to act in good faith, to avoid conflicts of interest, to refrain from self-dealing, and to provide full and fair disclosure of material facts in connection with transactions affecting MHP.

123.    Farber also owed fiduciary duties to honor and implement the governance and approval rights granted to Turnwell and/or Leon under the Investment Documents, including the obligation to ensure that MHP's Operating Agreement was amended to include the Turnwell-designated manager and to obtain required approvals for major transactions and indebtedness above a certain level.

124.    Farber breached his fiduciary duties to MHP and its members and managers by, among other things, engaging in conflicted, self-interested conduct and causing MHP to enter into transactions that were adverse to MHP and its members and managers, without proper approvals, disclosures, or safeguards.

125.    As admitted to in Farber's sworn declaration, and the findings of fact and conclusions of law entered by the Texas Business Court in support of its Final Judgment, Farber failed to implement Turnwell's bargained-for governance rights, including by failing to amend MHP's Operating Agreement to add the Turnwell-designated manager to MHP's

board of managers, despite MHP's contractual commitment to do so at the closing of the Investment Documents.

126. Farber also engaged in undisclosed, self-interested conduct by serving as Pathway's CEO while concurrently serving as MHP's CEO, all while Pathway was negotiating to acquire MHP's valuable assets and without disclosure to Turnwell, the Turnwell Manager, or MHP's other members and managers.

127. Farber further breached his fiduciary duties by causing MHP to execute a Conflict of Interest Disclosure and Waiver permitting BrownWinick to represent both MHP and Pathway in the contemplated transaction, without obtaining the prior approval of the Turnwell Manager or the members and managers of MHP, and by concealing the existence of the conflict waiver from Turnwell and the Turnwell Manager.

128. Farber breached his fiduciary duties by initiating and executing an Action by Consent of the Members and Managers of MHP that purported to approve the sale of MHP's equity in MHP Iowa, LLC and MHP Idaho, LLC to Pathway, while excluding the Turnwell Manager from notice and participation.

129. Farber breached his fiduciary duties by executing the Pathway UPA on behalf of MHP and the Secured Note without obtaining required approvals and consents, without a fairness opinion or other procedural protections, and while acting under a conflict of interest.

130. Farber breached his fiduciary duties by causing MHP entities to incur indebtedness and encumber their assets without required approvals, including through the

Paychex Factoring Agreement, the Secured Note, and the C6 Capital loan, and by failing to obtain the Turnwell Manager's consent where required.

131.    Farber breached his fiduciary duties by executing and concealing the Transition Services Agreement, including its backdated effective date, which diverted revenue and cash flow away from MHP and to Pathway, contributing to MHP's deterioration and insolvency.

132.    Farber breached his fiduciary duties by concealing material facts from Turnwell, the Turnwell Manager, and MHP's other members and managers, including the execution of the Pathway UPA documents, the Secured Note, and the TSA, and by failing to provide those documents or drafts until months later if at all.

133.    BrownWinick and Larson had actual knowledge of Farber's fiduciary duties to MHP and its members and managers, including Turnwell's governance and approval rights under the Investment Documents, because BrownWinick had served as MHP's outside counsel since at least August 2019, drafted MHP's Operating Agreement, negotiated and drafted the Investment Documents.

134.    BrownWinick and Larson knowingly participated in, aided, and abetted Farber's breaches of his fiduciary duties by providing substantial assistance, advice, drafting, facilitation, and strategic guidance that enabled Farber to act (or fail to act) as his fiduciary duties required.

135.    Specifically, BrownWinick and Larson knowingly participated in Farber's breaches by failing to advise Farber to amend MHP's Operating Agreement to include the Turnwell-designated manager and to effectuate Turnwell's bargained-for governance rights, thereby enabling Farber to operate MHP without the required oversight and approvals.

136. BrownWinick and Larson knowingly participated in Farber's breaches by advising and/or encouraging Farber not to disclose the Conflict Waiver to the Turnwell Manager and other members and managers of MHP, and by permitting Farber to execute the Conflict Waiver without obtaining required approvals.

137. BrownWinick and Larson knowingly participated in Farber's breaches by representing both MHP and Pathway in the negotiation, drafting, execution, and signing of the Pathway Transaction documents—including the Pathway UPA, Secured Note, TSA, and rendering advice in connection with the C6 Loan—while knowing that Farber was conflicted and acting as Pathway's CEO, of which the required approvals and disclosures had not been obtained.

138. BrownWinick and Larson knowingly participated in Farber's breaches by drafting the Action by Consent to approve the Pathway Transaction in a manner that excluded the Turnwell Manager, including by omitting any signature block for the Turnwell Manager, and by advising Farber not to disclose the Action by Consent to Turnwell.

139. BrownWinick and Larson knowingly participated in Farber's breaches by failing to advise that a fairness opinion and/or other Delaware-law procedural protections were necessary due to Farber's personal interest in the Pathway Transaction and by facilitating the transaction to proceed without such protections.

140. BrownWinick and Larson knowingly participated in Farber's breaches by advising Farber that obtaining consent from MHP's members and managers, including Turnwell, was unnecessary for the execution of the Pathway Transaction documents and

related indebtedness, despite BrownWinick's knowledge of the Investment Documents' consent requirements.

141.   BrownWinick and Larson knowingly participated in Farber's breaches by backdating the Transition Services Agreement to November 24, 2023 at Pathway's request, thereby facilitating concealment and impairing MHP's rights and remedies.

142.   BrownWinick and Larson knowingly participated in Farber's breaches by failing to act to protect or enforce MHP's interests when Pathway failed to perform under the TSA, instead advising Farber that MHP's concerns were merely a "business issue" to work out with Pathway.

143.   BrownWinick and Larson knowingly participated in Farber's breaches by advising Farber, in his capacity as Pathway's CEO, to sign the Consent of Managers approving the C6 Capital loan that listed certain MHP entities as borrowers and further encumbered MHP's assets, without advising Farber to obtain MHP's required approvals or to disclose the transaction to MHP's members and managers.

144.   On information and belief, BrownWinick and Larson's knowing participation was motivated, at least in part, by Larson's undisclosed personal investment interests in VB Acquisition Corp. and/or MHP through DSIF Investments LLC, which created an additional conflict of interest and incentive to facilitate the Pathway Transaction and related conduct adverse to MHP.

145.   BrownWinick and Larson had actual knowledge of Farber's fiduciary duties and substantially assisted and facilitated Farber's breaches, or, at minimum, acted in bad faith with

reckless indifference to the harm their conduct would cause to MHP and its members and managers.

146. As a direct and proximate result of Farber's breaches of fiduciary duty, aided and abetted by BrownWinick and Larson, MHP suffered substantial damages, including, but not limited to, loss of enterprise value, impairment of governance and approval rights, increased indebtedness, loss of revenue streams, and exposure to massive contractual liability.

147. As alleged above, MHP has suffered an $18 million judgment for its breach of the Investment Documents, and MHP's value has been destroyed—an entity once valued at over $25 million is now worthless—caused by and traceable to Farber's disloyal, conflicted conduct as knowingly aided by Larson and BrownWinick.

148. Leon brings this aiding-and-abetting claim as assignee of MHP's claims and associated privileges pursuant to written agreements.

## II.   Second Cause of Action: Tortious Interference.

149. Leon re-alleges and incorporates by reference all the allegations set forth above.

150. The Note, Note Purchase Agreement, and the Investor Rights Agreement, as integrated, is a valid and enforceable contract between Turnwell and MHP, as of March 7, 2022. These agreements, governed by Delaware law, afforded Turnwell significant governance and approval rights, including the right to designate a manager to MHP's board, the right to approve certain major transactions, and the right to receive specified consideration in the event of a sale or change of control.

151. BrownWinick and Larson had actual knowledge of the Investment Documents and Turnwell's contractual rights and protections because BrownWinick negotiated and

drafted the Investment Documents on behalf of MHP, served as MHP's counsel in connection with the Investment Documents, and continued to (until early July 2024) represent MHP in related corporate and transactional matters thereafter. Likewise, BrownWinick and Larson had previously drafted documents related to VBAC in 2022 that explicitly recognized Turnwell's rights under the Investment Documents.

152.    BrownWinick and Larson also knew that Turnwell's approval and/or the Turnwell Manager's consent was required for major transactions and incurring indebtedness over a certain threshold, including the proposed Pathway-related transactions.

153.    Despite having actual knowledge of the Investment Documents and Turnwell's contractual rights, BrownWinick and Larson intentionally and improperly interfered with Turnwell's contractual relationship with MHP by inducing, causing, and/or assisting MHP and its CEO, Farber, to breach the Investment Documents.

154.    BrownWinick and Larson interfered with Turnwell's contractual rights by, among other things, facilitating MHP's failure to implement Turnwell's bargained-for governance rights, including by failing to ensure MHP amended its Operating Agreement to add the Turnwell Manager, and by advising and enabling MHP to operate without the Turnwell Manager's oversight and participation.

155.    BrownWinick and Larson interfered with Turnwell's contractual rights by advising and/or permitting Farber to execute a Conflict of Interest Disclosure and Waiver allowing BrownWinick to represent both MHP and Pathway concurrently, without obtaining the Turnwell Manager's prior written approval or the approval of MHP's members and managers.

156.    BrownWinick and Larson interfered with Turnwell's contractual rights by helping MHP draft and execute the "Action by Consent of the Members and Managers of Mental Health Partnership, LLC" that purported to approve the sale of MHP's equity interests in MHP Iowa, LLC and MHP Idaho, LLC to Pathway, while excluding the Turnwell Manager from notice, participation, and signature, and by advising Farber not to disclose the Action by Consent to Turnwell.

157.    BrownWinick and Larson interfered with Turnwell's contractual rights by facilitating and orchestrating the negotiation, drafting, execution, and signing of transaction documents between MHP and Pathway—including the Pathway UPA, Secured Note, and TSA—without obtaining Turnwell's required consent prior thereto and in direct contravention of the approval and governance provisions of the Investment Documents.

158.    BrownWinick and Larson interfered with Turnwell's contractual rights by inserting or permitting false representations and warranties in transaction documents, including that all necessary approvals had been obtained and that governance documents were true, complete, and correct, when in fact the required Turnwell approvals and Operating Agreement amendments had not been obtained or made.

159.    BrownWinick and Larson interfered with Turnwell's contractual rights by permitting and facilitating the encumbrance of MHP's assets and the incurrence of additional debt that resulted in MHP having a debt service coverage ratio of less than 1.50 without Turnwell's consent, including through the Paychex Factoring Agreement, the Secured Note, and the C6 Capital loan that listed certain MHP affiliates as borrowers, all in violation of the Investment Documents.

160.    BrownWinick and Larson interfered with Turnwell's contractual rights by advising Farber that obtaining the consent of MHP's members and managers, including Turnwell and the Turnwell Manager, was unnecessary for execution of the Pathway Transaction documents and related indebtedness, despite BrownWinick's intimate knowledge of the Investment Documents' consent requirements.

161.    BrownWinick and Larson further interfered with Turnwell's contractual rights by backdating the TSA to November 24, 2023 at Pathway's request, and by failing to act to enforce or protect MHP's rights when Pathway failed to perform under that agreement, thereby worsening the harm to MHP and thus Turnwell's investment in MHP.

162.    BrownWinick and Larson's interference (including those acts referred to and described herein) was intentional, willful, and unjustified, and was undertaken in bad faith and/or with reckless disregard for Turnwell's contractual rights and the foreseeable harm to Turnwell.

163.    BrownWinick and Larson's conduct was undertaken with knowledge of Turnwell's rights, in bad faith, through conflicted representation of adverse parties, and by facilitating breaches of contract and concealment of material facts that prevented Turnwell from exercising its contractual governance and approval rights.

164.    As a direct and proximate result of BrownWinick and Larson's intentional and improper interference, MHP breached the Investment Documents, including by failing to add the Turnwell Manager to MHP's Operating Agreement, entering into transactions and incurring indebtedness without required approvals, and proceeding with the Pathway Transaction without Turnwell's consent.

165. As a direct and proximate result of the foregoing interference and resulting breaches, Leon suffered and continues to suffer substantial damages, including, without limitation, MHP's default and failure to repay Leon's $5 million investment, loss of its bargained-for governance and approval rights, loss of the value of its investment, impairment of its contractual protections, and exposure to and/or incurrence of litigation and enforcement costs.

166. Specifically, Leon seeks recovery of its expectation damages in the amount of $12,500,000 and a 20% compounded internal rate of return on Leon's initial $5,000,000 investment, calculated from March 7, 2022, until the day judgment is entered in this case, in accordance with Section II.5(a) of the Investor Rights Agreement.

167. In the alternative, Leon seeks $5,000,000 plus 10% annual interest, accruing from February 1, 2025, until the day judgment is entered in this case as specified in Section 4.1 of the Note.

168. Leon also seeks punitive damages for BrownWinick's and Larson's knowing and intentional acts.

## COSTS AND INTEREST

169. Leon re-alleges and incorporates by reference all the allegations set forth above.

170. Leon seeks costs of court and pre- and post-judgment interest at the highest rate agreed to by the parties or permitted by law.

## CONDITIONS PRECEDENT

171. Leon re-alleges and incorporates by reference all the allegations set forth above.

172. All conditions precedent to Leon's claims have occurred or are excused or waived.

## REQUEST FOR RELIEF

Leon requests that Defendants be cited to appear, and that the Court grants Leon the following relief:

1. $25,000,000 in actual damages, consequential damages, and/or diminution in value for aiding and abetting breaches of fiduciary duties by Scott Farber;

2. $12,500,000 and a 20% compounded internal rate of return on Turnwell's initial $5,000,000 investment, calculated from March 7, 2022, until the day that initial investment is returned, in accordance with Section II.5(a) of the Investor Rights Agreement in damages for tortiously interfering with Turnwell's rights under the Investment Documents;

3. Exemplary or punitive damages;

4. Pre-judgment interest as allowed by law;

5. Post-judgment interest as allowed by law;

6. All other legal and equitable relief to which Turnwell may be justly entitled.

## JURY DEMAND

Plaintiff hereby demands a jury trial as to all claims stated in this Complaint.

DATED:  March 10, 2026                    Respectfully submitted,


                                          */s/Gary Dickey*
                                          Gary Dickey
                                          Iowa State Bar No. AT0001999
                                          gary@iowajustice.com
                                          **DICKEY, CAMPBELL & SAHAG LAW FIRM, PLC**
                                          301 E. Walnut Street, Ste 1
                                          Des Moines, Iowa 50309
                                          Telephone:  (515) 288-5008
                                          Fax: (515) 288-5010


                                          **Admission Pro Hac To Be Filed:**

                                          */s/ Alan Dabdoub*
                                          Alan Dabdoub
                                          Texas Bar No. 24056836
                                          adabdoub@lynnllp.com
                                          Ryan Kemrite
                                          Texas Bar No. 24131428
                                          rkemrite@lynnllp.com
                                          **LYNN PINKER HURST & SCHWEGMANN, LLP**
                                          2100 Ross Avenue, Suite 2700
                                          Dallas, Texas 75201
                                          (214) 981-3800 Telephone
                                          (214) 981-3839 Facsimile

                                          **ATTORNEYS FOR PLAINTIFF LHP OT
                                          HOLDINGS, LLC**